**Ex parte Paul Eric KRUEGER.**

**No. 38435.**

Court of Criminal Appeals of Texas.

June 16, 1965.

Rehearing Denied June 26, 1965.

———◆———

Warren Burnett, Odessa, Luther E. Jones, Jr., Marvin Foster, Jr., Corpus Christi, for appellant.

Sam L. Jones, Jr., Dist. Atty., Nelson R. Sharpe, Asst. Dist. Atty., Corpus Christi, and Leon B. Douglas, State's Atty., Austin, for the State.

MORRISON, Judge.

This is an appeal from an order denying appellant bail, after indictment for murder in three cases numbered 1771, 1772 and 1773 in the District Court of Kleberg County.

After a careful consideration of the record, we conclude that appellant is entitled to bail in the sum of $15,000 in each of the three cases. The judgment of the trial court denying bail is reversed, and the appellant will be admitted to bail and released from custody upon the execution by him of a bond in the sum of $15,000 in each of the three cases, with good and sufficient sureties, conditioned and approved as the law directs.

Ordered accordingly.

## ON STATE'S MOTION FOR RE-HEARING

McDONALD, Presiding Judge.

The Constitution of Texas, under the section known as the Bill of Rights, Art. 1, Section 11, says: "All prisoners shall be bailable by sufficient sureties, unless for certain offenses, *when the proof is evident;* but this provision shall not be so construed as to prevent bail after indictment found upon examination of the evidence, in such manner as may be prescribed by law." The term "proof is evident", as therein used, means evidence clear and strong, leading a well-guarded judgment to the conclusion that an offense was committed; that *the accused is the guilty agent;* and that he would probably be punished capitally if the law is administered. Ex Parte Coward, 170 S.W.2d 754, 145 Tex.Cr.R. 593, and cases there cited.

The burden of proof is upon the State to show that refusal of bail is warranted.

Ex Parte Readhimer, 123 Tex.Cr.R. 635, 60 S.W.2d 788. Necessarily then, the trial court construed the facts presented as showing a case of "proof evident". In our original opinion we determined that the trial court was not authorized to reach such a conclusion, and we granted bail.

We did not in our original opinion recite the facts. We shall now do so.

The evidence adduced at the hearing is set forth as shown in the statement of facts and in the order therein adduced. M. S. Burton testified as the state's first witness. He related that he was a Sergeant of the Patrol Division of the Sheriff's Office of Nueces County; that he was called upon to go out to Flour Bluff and the Island there in Nueces County. He was accompanied by Deputy Sheriff Jim Murray and City Police Officers Tommy Lowrance and Manuel Garza. This was on Tuesday, April 13, 1965, at approximately 4:40. They went out on the John F. Kennedy Causeway to check bait stands, out on the Intracoastal Canal by the swing bridge. They were checking these bait stands for a missing boat. They found that an aluminum boat was missing from Graham's bait stand. The boat had either a 5 or 10 h. p. small outboard motor. After leaving the boat stand they came across the John F. Kennedy Causeway, across the Intracoastal Canal, 150 to 200 yards on the north side of the causeway along the edge of the channel and they found an aluminum boat, about ¾ths of a mile from Graham's bait stand. They then radioed for a helicopter to be sent where they were. About 15 minutes later a helicopter arrived from the Navy base, a short distance away. Burton and Garza got into the helicopter and went in a southerly direction approximately 6 miles to an island not accessible to a land vehicle. When they got out that distance they "spotted one body in the water", a human body. They stopped at the pier and could see underneath the pier. Burton said, "and I saw what appeared to be two more bodies under the pier". This was approximately 5:30 in the afternoon, and they were ap-

proximately 100 feet up in the air. They landed on the little spoil island. There was a little shack on the island. The bodies were found about 200 to 250 feet from this shack. Burton remained with the bodies and then Manuel Garza and Tom Lowrance arrived. The island is located in Kleberg County. Burton testified he was present the next morning when the items found in the missing boat were taken to the Sheriff's Office. He testified that 4 rifles and a shotgun, camping paraphernalia, a sleeping bag, cans of gasoline, some ammunition, a tent, a machete, two gigs and an army helmet were found in the boat the officers had located. He inspected the cabin or shack and there was no sign of a struggle. They found some ejected shells on the ground approximately 12 feet from the end of the pier, approximately 93 or 94 feet from the first two bodies. Burton testified that he found 6 empty cartridges and 1 live round. There was no marking on the base of the bullet that would state the caliber. "They appeared to be 243." He found some two-pronged gigs and 3 fishing poles on the end of the pier and in the water. They found a 17 foot long Mercury 75 h. p. boat, tied to the pier with a rope. They "saw tracks all over the place", but no plaster casts were made, so far as Burton knows.

Tom Lowrance testified for the state and related that he assisted the undertaker in getting the bodies. One man's body had two distinct holes, 3 to 4 inches in diameter in it. Ammunition found was 243, "that Armalite type", and he found one large 30 cartridge shell. One of the weapons found in the missing boat, 458 Magnum, appeared to have been fired recently. There was one empty shell in the barrel, the only one in it. He found no Magnum ammunition in the boat. None of the other guns appeared to have been recently fired.

William L. Burch, deputy sheriff at Corpus Christi, testified that he took the pictures of the dead men, admitted without objection.

Mrs. Edna E. Krueger testified as a state's witness. She related that she lived in San Clemente, California; that she was the mother of the appellant; that appellant was 17 years of age on his last birthday this year, January 9. Here we quote Mrs. Krueger's testimony:

Q: "Now then, I believe that for some time prior to April 9th of this year, your son had collected various rifles and pistols, is that correct?"

A: "Yes".

Q: "Can you tell us what weapons were in your son's collection?"

A: "I don't know what weapons were in his collection."

Q: "Or the make or caliber?"

A: "No".

Q: "Had you ever accompanied him to the sporting goods store there in San Clemente when he purchased a 458 Magnum rifle?"

A: "I accompanied him."

Q: "On the purchase of that particular rifle?"

A: "Several times when he purchased rifles."

Q: "Can you tell us how long he had had a 458 Magnum rifle?"

A: "No, I don't exactly remember."

Q: "Did he purchase it sometime last fall?"

A: "I don't really know."

Q: "Do you know whether or not before April 9th of this year your son had also purchased what is known as an A.R. 15 or Armalite rifle?"

A: "He purchased one, I don't know if that was it, but I know he purchased one, his last purchase."

Q: "His last purchase was a rifle of that nature?"

A: "I don't really know."

She last saw her son late in the afternoon of April 9, 1965. She had a 1963 Thunderbird. She testified that she and her husband went out to dinner, and she left her car at home. She later claimed the car in Kingsville, Texas. When she returned home from dinner her son was gone and her Thunderbird was missing. She notified the San Clemente Police Department and she checked her son's gun collection and found some of the guns missing. She related that her son had 3 or 4 pistols. She further testified that she got a call from her son from Casas Grande, Mexico, and that her son used the name Bud Lauer to call her. She stated that she knew he was wanted for three murders when she received the call, but she did not report the call to anyone except her husband. She offered to go to him, but she did not ask him to surrender himself or to come home. She next saw her son in jail in Juarez, Mexico. She testified that his hair wasn't "quite as short as this, but it wasn't long", in California.

Robert E. Morris testified for the State and related that he worked at Graham's bait stand, Padre Island. The witness related that he saw appellant and another boy, a dark complexioned boy with heavy whiskers. He rented a boat to the dark complexioned boy, his testimony reflecting that this was prior to the witness hearing about 3 men being killed over on the Intracoastal Canal. Morris testified that he rented a 5½ h. p. Johnson Motor for 12 hours and the boy handed him a $10.00 bill. He showed the appellant how to run the boat. The boy with the beard left in the car, and the witness did not see the boat again until Wednesday morning. The boat was a 14 foot Starcraft, aluminum type boat. The boat was returned to him by the Sheriff's Office of Nueces County. It was the one they had discovered over on Packery Channel. Morris stated that the young man who rented the boat wrote his name down as Angles.

Sam Parrino testified that he worked at Buck's Sporting Goods, Corpus Christi. On Monday, April 12, 1965, he saw the appellant and another individual with a heavy beard, at the store where he worked. They bought $15.08 worth of items, including 3 five gallon fuel cans, Admiration make. He filled them with fuel, and they also bought two flounder gigs. He identified the two gigs introduced in evidence by the state as being similar to the ones that he sold them. They paid for the purchase with a Richfield Credit Card signed by Paul Krueger. They bought nothing else but the cans, fuel and gigs. They did inquire about shotgun shells, but Parrino did not have them. They made inquiry about two magazines for sporting type high powered rifles. He said he didn't carry such items, but he wrote down on a brown paper bag the type of gun and the street number of the House of Guns in Corpus Christi, and he called there in the boys' presence, and told them to go to the House of Guns.

Chief Deputy Constable, Precinct No. 8, Nueces County, Lee Brown, testified that he was on duty at Padre Island near the toll gate; that he saw a 1963 Thunderbird with California license plates on Sunday afternoon. He checked to see if it were stolen because the two persons in the car, the manner of their dress, and their appearance, did not seem to match the expensive car. He identified appellant as one of the people in the car. He got a report that the car was not stolen. Mr. Brown stated that he saw the car at the Dunes Motel on Sunday night and then on Monday morning he saw the two men in the car heading out toward Padre Island towards the beach.

Sheriff Johnny Mitchell of Nueces County testified that he went to Graham's bait stand with Sheriff Scarborough, Ralph McGee and Bill Worth. Undertaker Ross Langham joined the party at the bait stand, and they went in a Texas Game Commis-

sion boat over about 6 miles away to Marker 35A on the Intracoastal Canal. About 6 or 8 feet on the beach from the pier he took possession of some spent rifle shells. He stated "one was a 30 caliber carbine and the others were Armalite ammunition, small size, small shell, small caliber." He saw the three bodies and was there when they were brought up on the pier. The sheriff testified that he had been a law enforcement officer 27 years and had seen the results of shots from different kinds of guns. He had examined wounds on persons caused by different types and caliber of rifles. He testified that he did not do any ballistical study on any slugs found in the bodies and didn't know that any had been done. He had been advised by the doctor who did the autopsy, that some slugs were removed from the bodies, but "I don't know". He stated that he released all of the evidence to the sheriff of Kleberg County. He further testified that the body that had the two large holes in the stomach was that of Mr. Little. The sheriff was then asked: "From the size of the holes, caused by whatever gunshot it was, excluding the 458 Magnum, in your opinion, could that wound have been caused by any of the other guns in that boat?" The sheriff replied: "no." Objection was then taken and the Court said: "I will sustain the objection as to the small holes, but I will overrule the objection as to the large one." Sheriff Mitchell was then asked: "And, in your opinion, would you say the 458 Magnum could have caused it?" He replied: "Yes". The sheriff further testified that a 458 Magnum "is referred to in the way of hunting as an elephant gun or rhino gun." He stated that a 458 Magnum was recovered from the boat that he examined. He testified that he examined the gun and there was a spent shell in it and the chamber still had powder burns in it. He testified that he observed the two large wounds and they could have been caused by any 454 or 458 Magnum, but he didn't believe a pistol would do it because the grain of the bullet is not big enough, but that there are probably pistols made

that would match a 458 Magnum, and "a Magnum type gun is a common weapon." The sheriff testified that he made no fingerprints, nor did he cause any kind of laboratory study to be made. He further testified: "It wasn't my case. I felt there should have been." He related that he did not know of any type of laboratory test that was made to determine whether or not there was blood on the gigs. There was some stain on there but he did not know whether or not it was checked to determine what it was.

Orval Hathcoat testified that he was deputy sheriff of Kleberg County and that he went to El Paso and returned appellant to Kleberg County.

Hazel Kramme testified that she was District Clerk of Kleberg County; that she had checked the records and $15,000.00 was the maximum amount of bail that has been set in Kleberg County.

Sam Jones, the District Attorney of Kleberg County testified that he was aware that John Angles was in custody. as a juvenile from Kleberg County but that he had made no effort whatsoever to get Angles for the hearing.

We agree that the state is correct that "Evidence of flight or avoidance of arrest has been held to be of the strongest probative value", as stated in Edwards v. State, 156 Tex.Cr.R. 146, 239 S.W.2d 618. However, in Edwards' case the facts in that homicide were considerably stronger from the state's standpoint than in this case. Edwards surrendered the day following the murder and went with a deputy sheriff to his brother's house and there delivered the pistol which he had used. A slug taken from the decedent's body was established to have come from this pistol. A paraffin test of Edwards' hands showed that he had recently fired a gun. Flight must also be supported by cogent evidence. Standing virtually alone, as here, it is insufficient to constitute "proof evident."

While the state takes the position that appellant's gun collection included a 458 Magnum rifle and an A.R. 15 rifle, relying upon the testimony of Mrs. Krueger to support their position, we observe that the testimony of Mrs. Krueger quoted hereinabove in its entirety, reflects that she did not know what weapons were in her son's gun collection, nor did she know the make or caliber. Her testimony does not prima facie establish that appellant had either a 458 Magnum rifle or an A.R. 15 rifle. We observe that the officers had in their possession the Magnum rifle recovered by them from the boat Angles rented. This rifle could have been shown to appellant's mother and would have permitted her to testify whether it or a similar gun was in appellant's collection. The A.R. 15 could also have been shown her, and she could have been asked whether any similar gun had been observed by her in appellant's collection. Neither of these things was done.

Assuming that there was evidence from which there might be inferred that appellant had a Magnum rifle and an A.R. 15 rifle, his having them could have inculpatory significance only if there were additional proof tending to connect them with one or more of the killings. We find no proof of that kind.

From the facts it is evident that the State failed to meet the burden of showing a case where the proof is evident. There was no testimony showing that any of the various weapons recovered from the boat fired shots into the bodies of any of the three deceased men. The nearest that the state ever got was to show from Sheriff Mitchell's testimony that a 458 Magnum could have caused it. The state adduced no testimony showing any plaster casts taken of footprints on the island where the bodies were found. No ballistic tests were shown, no slugs were introduced, no fingerprints were taken, no blood tests were made. The nearest point shown from the record that appellant reached in proximity to the bodies was six miles away.

We have through the years adhered to the well established rule for observance in cases of this nature: (1) The burden of proof is on the state to establish by evident proof that a capital offense has been committed; (2) that by the same character of proof the accused is the guilty perpetrator of said offense; and (3) that to deny bail, the court must find these propositions in the affirmative. Ex Parte Gragg, 149 Tex.Cr.R. 10, 191 S.W.2d 32. In Ex Parte Merrill, 150 Tex.Cr.R. 365, 201 S.W. 2d 232, we held: "An essential element to constitute proof evident so as to justify refusal of bail to one charged with a capital offense is that the accused is guilty of the capital offense charged." Judge Hawkins, speaking for this Court in Ex Parte Fleming, 97 Tex.Cr.R. 304, 261 S.W. 1037, said: "Bail is a matter of right, unless the state shows contrary, and no inference can be indulged against accused." In Ex Parte Shults, 127 Tex.Cr.R. 484, 77 S.W.2d 877, bail was granted in a murder case. After indictment, this Court reversed the action of the trial court denying bail. In Ex Parte Donohoe, 112 Tex.Cr.R. 124, 14 S.W.2d 848, the judgment denying bail was reversed in a murder case and bail granted. This Court, speaking through Judge Christian said that the burden is on the state to show that accused is not entitled to bail, which is granted as a matter of right by virtue of the Constitution of Texas, Art. 1, Section 11. Ex Parte Alford, 97 Tex.Cr.R. 410, 261 S.W. 1041 and Ex Parte Powell, 107 Tex.Cr.R. 648, 298 S.W. 575, were cited in this case. Judge Hawkins stated in the Alford case, a murder case, that bare presence of a party at the scene of commission of a crime is insufficient to show guilty connection therewith as respects right to bail. Judge Christian stated in the Powell case: "In absence of proof of motive or explanation for killing, court erred in denying bail to one charged with murder; fact that fair jury would likely inflict death penalty not being evident." We held in the rather recent murder case of Ex Parte Thrash, 167 Tex.Cr.R. 409, 320 S.W.2d 357, that

the burden was upon the state to establish that the proof was evident, and, on the record presented, it was error to find that such burden had been sustained. In Ex Parte Collins, 168 Tex.Cr.R. 500, 330 S. W.2d 194, bail was granted in a murder case where there was no such "proof evident" as would justify denial of bail.

The writer has long felt that the facts in a hearing of this kind should be adequately discussed in our opinions so that the bench and bar of this state may be able to appraise the opinion properly. It is for that reason that I have gone into all of the facts adduced in this case.

The state's able counsel discussed and cited by brief and oral argument several cases. We shall discuss them and distinguish them from the case at bar. The Edwards case has already been discussed. Ex Parte Cogdell, 157 Tex.Cr.R. 187, 247 S.W.2d 888, is next cited. No facts are shown in the opinion in that case, other than the mere mention that "[w]e have read appellant's brief and the statement of facts in its entirety and are of the opinion that the trial court should be sustained in denying bail in this case. * * * While not commenting upon the testimony at this time, we think the judge was supported by the evidence."

In Ex Parte Gibson, 149 Tex.Cr.App. 573, 197 S.W.2d 543, the facts presented by the state show that relator and his brother assaulted the deceased and 47 knife wounds were inflicted. The brothers were both on the body of the deceased and striking him until he ceased talking and expired.

In Ex Parte Roberts, 169 Tex.Cr.R. 311, 334 S.W.2d 171, an investigator talked with appellant, trying to find out where deceased might be found, and that "she told him she had shot deceased, that she would take him and show him where the body was", they then went to the place directed by appellant and found the body.

In Ex Parte Stephens, Tex.Cr.App., 388 S.W.2d 199, (the writer being the author of that opinion and not stating the facts in detail, for which I assume responsibility) the mere statement is made that "[t]he evidence is sufficient to justify a finding by the trial judge that the appellant shot and killed the deceaseds * * *."

In Ex Parte Washburn, 161 Tex.Cr.R. 651, 280 S.W.2d 257, this Court stated that the question before us is whether appellant is identified as the person who committed the offense or is identified as having a guilty connection with the commission of the offense by another person. The opinion relates that the facts relied upon to establish that identity are circumstantial and yet the facts are not set out. The statement is made that in cases of this kind we refrain from stating the facts at length or from expressing a conclusion as to the sufficiency of the evidence to show appellant's guilt so that the trial judge may proceed without any pre-judgment by this court of the sufficiency of the evidence against appellant, and yet, the opinion then states that the entire statement of facts has been read, and *many circumstances exist which point to the appellant as the perpetrator of the murder, as also to a motive therefor*. The conclusion is then expressed: "Viewing the facts as a whole, we are unable to agree that the trial judge was in error in reaching the conclusion that this is not a bailable case." My question posed is that: How are we to talk about MANY CIRCUMSTANCES pointing to appellant as the perpetrator of the murder and the motive, unless we do set out the facts, so that persons throughout the state will know the value of the opinion as precedent and be able to rely upon it. The appellant and the prosecutor know these facts for they have seen the record, but the other members of the bench and bar only have to assume what the facts are. It seems to me that we indulge in legal fiction in a case of this kind, which I confess being guilty of in Ex Parte Stephens, supra. All that the opinion in Washburn

actually stands for is that this court agreed with the ruling of the trial court. If we are, in the writer's judgment, to find the facts sufficient, we should state them. If we find them insufficient, we should state them.

The cases of Johnson v. State, 156 Tex. Cr.R. 534, 244 S.W.2d 235 and Martinez v. State, 140 S.W.2d 187, cited by the state, deal with flight. We have discussed this aspect above.

It is clear to us that none of the cases cited by the state, and we have discussed and distinguished them all, support the state's position.

Adverting to our first paragraph in Ex Parte Coward, supra, wherein it is stated that "proof evident" means evidence clear and strong, leading a well-guarded judgment to the conclusion that an offense was committed; that the accused is the guilty agent; and that he would probably be punished capitally if the law is administered; when we apply the doctrine thus enunciated to the facts in evidence, as shown in the record before us, we are not satisfied that the "proof is evident." Consequently, we still believe that the appellant is entitled to bail. We do not wish to be understood as saying that he is not guilty of murder of one or more of the three men and that this fact may not be made to appear most fully upon his trial. We are only passing upon the sufficiency of the evidence as exhibited in this record, and upon it alone is our opinion predicated.

Remaining convinced that we properly disposed of this case in our original opinion, the State's Motion for Rehearing is overruled. In view of the constitutional term of this Court coming to an end this day, no further motion for rehearing will be entertained.

MORRISON, Judge (concurring).

The record before us on rehearing contains the same evidence which we con-sidered originally. Remaining convinced that our original opinion was a proper disposition of this appeal, I would overrule the State's motion for rehearing without written opinion.

WOODLEY, Judge (dissenting).

The State's motion for rehearing was filed, submitted and argued June 23rd. June 26th being the last day of the present term it is difficult to write a full statement of my disagreement with the opinion overruling the State's motion. Suffice it to say that the opinion is without precedent, as in the view of the writer is the conclusion that the trial court erred in denying bail.

It is regrettable that this Court should abandon the policy of refraining from stating the facts at length and of expressing a conclusion as to the sufficiency of the evidence to show appellant's guilt; the purpose of such policy being that the trial should proceed without such prejudgment by this Court.

Since the facts have been set out at great length, I deem it necessary to state further facts and restate others which I consider relevant on the sole question presented by appellant's brief: "The trial court abused its discretion in denying appellant bail," and by the state's answering proposition "The trial court did not abuse its discretion in denying appellant bail."

Appellant left his home in San Clemente, California on April 9, 1965. His mother's 1963 Thunderbird and some of appellant's guns were found missing. The police were notified.

On Monday, April 12, appellant and his companion Angles made purchases at Buck's Sporting Goods Store in Corpus Christi, including three five gallon fuel cans which they had filled with premixed gas and oil for a motor boat and two flounder gigs.

The witness Parrino helped place the cans of fuel in the automobile with California license plates and appellant paid for the

purchases with a Richfield Credit Card and signed the slip.

Appellant and his companion inquired about shotgun shells and two magazines for sporting type high powered rifles. Mr. Parrino did not have the shot they requested or the clips and referred them to "The House of Guns", another store. He testified:

"Q. This time of year, is there anything unusual about having calls for the type of ammunition and clips these two parties were asking for?

"A. Normally, as I stated, I have been around quite a bit, this is the first call I have ever had for such rifles. I don't recall, I have only been in this part of the country since '61, and I retired from the service, and that was my initial call for that particular type of clips.

"Q. Now are the gun shells you stock bird shoot, duck shot?

"A. That's right, sir.

"Q. Were the shots they were asking for larger than bird shot and duck shot?

"A. If I recall right, I believe it was."

On Tuesday, April 13, Deputy Sheriffs of Nueces County based upon information they had received, went to Graham's Bait Stand on the west side of the Intracoastal Canal and there confirmed the information they had that an aluminum boat with a 5 or 10 horse power motor was missing.

Robert E. Morris, employee at Graham's Bait Stand, identified appellant as the man who came to the bait stand on the afternoon of April 12 with a dark complected boy who rented a 14 foot Starcraft aluminum type boat, paying $10 for 12 hours and signing the name John P. Angles on his book. (Ex. 21) Morris testified:

"Q. Which one of the two boys actually got in the boat?

"A. Well, sir, this boy here was in the boat, when I went out to put the motor on, I put the motor on and went back for a couple of lifebelts, when I went back this boy was in the boat and said he didn't know how to run the boat, I showed him how to turn the motor to get started, shoved the boat off, and he said he was going to take it off out there and get used to running it.

"Q. At the time where was the other boy?

"A. He went to the car. I looked up when I got the other boy shoved away with the boat, although may I state, when I shoved him away, I saw the fishing rods, and I asked him if he needed any bait, and he said no, he was going to run the boat around and see how to run it, he didn't have no fishing rod in the boat, and I thought to myself, I better get the car number, which I seldom do, and I looked up and the car was leaving.

"Q. The boy with the beard was in the car and leaving?

"A. Yes, sir."

The officers then proceeded to a point along the edge of the channel where they confirmed the information they had received. They found the boat in which were the things they were looking for and which they had received information on:

The guns, camping equipment, oil cans and other articles described in the majority opinion, including the so called Elephant Gun or Magnum which the testimony of the mother of the appellant, though dimmed no doubt by a mother's love, identified as similar at least to guns belonging to appellant.

Having confirmed the information they had received at the boat stand and at the place where the rented boat and its contents was found, the officers requested that a helicopter be sent, the purpose being "on information that we had received at first, to look for some men":

"Q. Was there somewhere else, based on your information, you were supposed to go?

"A. Yes, sir, approximately six miles down the spoil banks of the Intra-coastal Canal.

"Q. Was that accessible to a land vehicle?

"A. No, sir.

"Q. Was that the reason you called for the helicopter?

"A. Yes, sir.

\* \* \* \* \* \*

"Q. Now which direction, if you know, did you proceed in this helicopter?

"A. In a southerly direction

"Q. Was this the direction, going in that direction, on your direct-tion? I mean, did you direct the pilot which way to go?

"A. Yes, sir, I told him what we were looking for.

"Q. This was based on prior information?

"A. Yes, sir.

"Q. And I believe you stated you went out a distance approximately six miles?

"A. Yes, sir.

"Q. Which general direction was that?

"A. Southerly direction.

"Q. And when you got out that distance, what did you first see or observe, if anything?

"A. We spotted one body in the water.

"Q. Spotted a human body?

"A. A human body in the water, a pier, and a boat tied to the pier. After we turned—

"Q. I want you to tell me what you could see up there in the helicopter. Go ahead. I think you were going to do that but I want to be sure.

"A. After we turned into the wind, northeast wind, at that time you could see underneath the pier, we stopped at the pier, then we could see under the pier, and I saw what appeared to be two more bodies under the pier.

\* \* \* \* \* \*

"Q. All right. Now upon seeing those bodies in the water, as you have described, did that confirm information that you already had?

"A. It did.

"Q. That was what you were looking for?

"A. It was what I was looking for."

The gruesome find on the spoil bank leaves no doubt that some person or persons murdered the three unarmed fishermen, one with two shots from a gun such as the recently fired 458 Magnum found in the boat rented by appellant and Angles.

Though the source of the information which led the officers to the boat stand; the rented boat and to the spoil bank where the murdered men were found is not directly shown in the record, it is clear that appellant's companion Angles, who rented the boat and then left the boat stand in the automobile, was in custody and only a person who was at the boat stand; at the place where the rented boat was abandoned

and at the spoil bank could have furnished such information.

As for appellant, he was next heard from several hundred miles from the scene of the murder when his mother received a telephone call from "Bud Lauer" at Casas Grande, Mexico, and her son, the appellant, talked to her. She knew he was wanted in connection with the three killings. "It was in all the papers." She told no one of the call except her husband. Later she proceeded to Juarez, Mexico where she saw appellant in jail.

After having been released to United States authorities who had a Federal warrant for his arrest as a fugitive from justice, appellant was arrested at El Paso on April 23, 1965 and returned to Kleberg County. His mother claimed ownership of the 1963 Thunderbird and signed receipt therefor when she received it from the District Attorney's office in Kingsville on April 30.

Why did appellant abandon the automobile, his guns and other property and flee to the Republic of Mexico?

Appellant and John P. Angles, who gave his address as Hollywood, California, were jointly charged by complaints sworn to and filed April 14, 1965 with the murder of Noel Little, John David Fox and Van Dave Carson.

Appellant's counsel elicited from the witness Morris the following:

"Q. All right. I want to ask you this question, did you ask for any identification at all from the young man to whom you rented the boat?

"A. Just to write his name down on the book.

"Q. And he wrote his name down as Angles.

"A. Yes, sir.

"Q. Have you seen him since?

"A. Yes, sir.

"Q. Where?

"A. They brought him out to the bait stand when they took him down to look for the guns."

The trial court was not without evidence from which he could conclude that appellant and Angles had no intention of returning the boat they had rented for 12 hours; that at the time appellant drove the boat off, supposedly for a trial run, and Angles drove away in appellant's Thunderbird, they planned to and did meet later and take the gasoline sufficient for a long trip; the guns and the camping equipment out of the car and load them into the boat; Angles was taken into custody and led or directed officers to the place where they rented the boat; to the boat where they had abandoned it, and to the spoil bank where the three unarmed men had been murdered.

It should be remembered that the state was not bound to prove that appellant shot and killed either of the three men. Proof that he agreed to the murder and was present or that he for other reasons was a principal in the murder was sufficient to warrant the extreme penalty.

I would overrule the contention that the trial judge abused his discretion in denying bail and would grant the state's motion for rehearing.

If bail is granted it should be fixed in an amount which would more likely assure the presence of the appellant when his case is called for trial.

I respectfully dissent from the overruling of the state's motion for rehearing.